IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| NENA ANSAGAY, et al., | ) | CIVIL NO. 15-00184 SOM/RLP |
| | ) | |
| Plaintiffs, | ) | ORDER DENYING MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| vs. | ) | |
| | ) | |
| DOW AGROSCIENCES LLC; VAN | ) | |
| WATERS & ROGERS CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

## I.        INTRODUCTION.

Before the court is Defendant Dow Agrosciences LLC's Motion for Summary Judgment against Plaintiffs.  Plaintiff Nena Ansagay brought a suit individually; on behalf of the estate of her deceased husband, Benjamin O.K. Ansagay; and on behalf of their minor child, in connection with the death of Benjamin Ansagay, which Nena Ansagay attributes to his contact with Dursban TC, a pesticide manufactured by Dow.  Dow contends that all the state-law claims are preempted under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA").

For the reasons discussed below, the court denies Dow's motion.

## II.        BACKGROUND.

Dow developed, manufactured, marketed, and distributed an insecticide called "Dursban TC," which has as an active

ingredient the chemical chlorpyrifos.  See ECF No. 17-1, PageID # 204.

In 1981, Dow registered Dursban TC with the United States Environmental Protection Agency, pursuant to FIFRA.  See ECF No. 16-1, PageID # 170.  FIFRA is a comprehensive regulatory statute regulating the use, sale, and labeling of pesticides.  See 7 U.S.C. § 136 et seq.  FIFRA requires a manufacturer seeking to market a pesticide to first petition the EPA for registration.  As part of the petition process, the manufacturer must submit data about the pesticide, as well as a proposed label.  See 7 U.S.C. § 136a(c)(1)(C), (F).

Dursban TC was sold with an EPA-approved product label that included the following words:  "WARNING," "MAY BE FATAL IF SWALLOWED," and "EXCESSIVE ABSORPTION THROUGH SKIN MAY BE FATAL."  See ECF No. 17-3, PageID #s 207-08.  The label instructed users to observe the following handling procedures for safety:

> Wear protective clothing when using or handling this product to help avoid exposure to eyes and skin.  As a minimum, chemical workers' goggles, neoprene or natural rubber gloves and footwear, a long-sleeved shirt and long-legged pants or coveralls are recommended.  To avoid breathing spray mist during application in confined areas, wear a mask or respirator of a type recommended by [the National Institute for Occupational Safety and Health] for filtering spray mists and organic vapors.

See id.  The label also included a "Warranty Limitations and Disclaimer" section that said, "[T]his product conforms to the

2

chemical description on the label and is reasonably fit for the purposes stated on the label when used in strict accordance with the directions therein under normal conditions of use." See id., PageID #s 209-10.

From 1988 to 1991, Mr. Ansagay, a pesticide applicator for XTermco, Inc., used Dursban TC on an almost daily basis. See ECF No. 32, PageID # 809. Before his death, he admitted that he had not worn a respirator when applying Dursban TC, notwithstanding the instruction on the safety procedures on its label. See ECF No. 24, PageID # 536. According to Mr. Ansagay's deposition testimony in a related worker's compensation case against XTermco, he did not believe he needed to wear a respirator because he had been told by the distributors of Dursban TC that the pesticide was safe for humans and would "flush out" of his body within a week. See id. One of Mr. Ansagay's co-workers corroborated this statement, testifying that "representatives that sold Dursban TC to XTermco, Inc., told me and other ground treatment workers, that Dursban was safe to use because if it got in your system it would flush out of your system within one week." ECF No. 20-3, PageID # 423. The distributors that allegedly sold Dursban TC to XTermco were Defendant Van Waters & Rogers Corporation and Brewer Environmental Industries. See ECF No. 20-2, PageID # 421. Mrs. Ansagay alleges that Dow intended that sellers like Van Waters,

3

and users like Mr. Ansagay, would rely on claims Dow published stating that Dursban TC was safe.  See ECF No. 32, PageID #s 809-10.

Mrs. Ansagay alleges that Mr. Ansagay began to suffer from an assortment of health problems after his employment with XTermco ended.  From 1999 to 2011, Mr. Ansagay was treated for depression.  See id., PageID # 811.  During this time, Mr. Ansagay was also diagnosed with hypogonadism and male infertility, which was originally attributed to a genetic disorder.  See id.  In 2011, Mr. Ansagay learned that he had contracted lung cancer.  See id.

On November 21, 2013, Mr. Ansagay filed a worker's compensation claim against XTermco that ended with XTermco's insurer accepting liability.  See id., PageID # 812.  Mr. Ansagay died on August 15, 2014, from lung cancer.  See id., PageID # 809.

On April 2, 2015, Mrs. Ansagay, on behalf of herself, Mr. Ansagay's estate, and their minor child, instituted a civil action against Dow in the Circuit Court of the First Circuit, State of Hawaii, Civil No. 15-1-0602-04.  See ECF No. 1-1, PageID # 11.

On May 18, 2015, Dow removed the action to this court.  See ECF No. 1.

In her Complaint, Mrs. Ansagay alleges that Mr.

4

Ansagay's exposure to Dursban TC resulted in his infertility, depression, hypogonadism, lung cancer, and death.  See ECF No. 32, PageID # 806.  The Complaint asserts claims against Dow for: (1) wrongful death; (2) negligence that caused Mr. Ansagay's cancer; (3) negligence that caused Mr. Ansagay's infertility and depression; (4) breach of express warranties; (5) breach of implied warranty; (6) strict product liability; (7) defective design, testing, and/or manufacturing; (8) negligent infliction of emotional distress; and (9) intentional infliction of emotional distress.  See id., PageID #s 816-21.[1]

III.      **STANDARD OF REVIEW.**

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2010).  See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  A movant must support his position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

---

[1] During the pendency of this motion, Mrs. Ansagay amended the Complaint by identifying Van Waters as one of the Doe Defendants.  See ECF No. 32.  Because the First Amended Complaint is identical to the original Complaint in all other respects, compare ECF No. 1-1, with ECF No. 32, the amendment does not affect the disposition of this motion.

those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See id. at 323. A moving party without the ultimate burden of persuasion at trial—usually, but not always, the defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party must set forth specific facts showing that there is a genuine issue for trial. T.W. Elec. Serv., Inc., 809 F.2d at 630. At least some "'significant probative evidence tending to support the complaint'" must be produced. Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)). See Addisu, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587). Accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

All evidence and inferences must be construed in the light most favorable to the nonmoving party. T.W. Elec. Serv., Inc., 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.

Id.  When "direct evidence" produced by the moving party

conflicts with "direct evidence" produced by the party opposing

summary judgment, "the judge must assume the truth of the

evidence set forth by the nonmoving party with respect to that

fact."  Id.

## IV.      ANALYSIS.

Dow's motion contends that Mrs. Ansagay's tort claims

are all preempted under FIFRA because it would be impossible for

Dow to comply with both FIFRA and the state-law duties that Mrs.

Ansagay seeks to impose.  See ECF No. 16, PageID # 161.  This

court disagrees.  FIFRA does not preempt Mrs. Ansagay's claims.

### A.   Preemption.

Preemption derives from the Supremacy Clause in the

United States Constitution, which provides:

> This Constitution, and the Laws of the United
> States which shall be made in Pursuance
> thereof; and all Treaties made, or which
> shall be made, under the Authority of the
> United States, shall be the supreme Law of
> the Land; and the Judges in every State shall
> be bound thereby, any Thing in the
> Constitution or Laws of any State to the
> Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

The United States Supreme Court has noted two

cornerstones of preemption jurisprudence.  Wyeth v. Levine, 555

U.S. 555 (2009).  First, "the purpose of Congress is the ultimate

touchstone in every pre-emption case."  Id. at 565 (quoting

8

Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (internal quotation marks omitted)).  Second, preemption analysis begins with the "presumption that Congress does not intend to supplant state law." De Buono v. NYSA-ILA Med. & Clinical Servs. Fund, 520 U.S. 806, 813 (1997); see also Tillison v. Gregoire, 424 F.3d 1093, 1098 (9th Cir. 2005).  In analyzing preemption, a court must keep in mind that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." City of Columbus v. Ours Garage & Wrecker Serv., Inc., 536 U.S. 424, 426 (2002) (quotation marks and brackets omitted).  Accordingly, courts confronted with two plausible interpretations of a statute "have a duty to accept the reading that disfavors pre-emption." Id.; see also Wyeth, 555 U.S. at 565; Cipollone v. Liggett Group, Inc., 505 U.S. 504, 518 (1992).

State law may be preempted by federal law in three ways:  (1) express preemption, which exists when Congress has explicitly defined the extent to which its enactments preempt state law; (2) implied field preemption, which exists when state law attempts to regulate conduct in a field that Congress intended federal law to occupy exclusively; and (3) implied conflict preemption, which exists when state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives Congress had, or when compliance with both state

9

and federal requirements is impossible.  See Indus. Truck Ass'n, Inc. v. Henry, 125 F.3d 1305, 1309 (9th Cir. 1997) (citing English v. Gen. Elec. Co., 496 U.S. 72, 78-80 (1990)); accord Whistler Invs., Inc. v. Depository Trust & Clearing Corp., 539 F.3d 1159, 1164 (9th Cir. 2008) ("Congress has the constitutional power to preempt state law, and may do so either expressly-- through clear statutory language--or implicitly." (citations omitted)).  With respect to each type of preemption, "Congressional intent to preempt state law must be clear and manifest."  Indus. Truck Ass'n, 125 F.3d at 1309.

When, as happens here, Congress has included an express preemption clause in the applicable federal statute, the court must look to the text of that provision to determine the scope of preemption.  See Lohr, 518 U.S. at 484-85.

> When Congress has considered the issue of
> pre-emption and has included in the enacted
> legislation a provision explicitly addressing
> that issue, and when that provision provides
> a "reliable indicium of congressional intent
> with respect to state authority," "there is
> no need to infer congressional intent to
> pre-empt state laws from the substantive
> provisions" of the legislation.  Such
> reasoning is a variant of the familiar
> principle of expression unius est exclusio
> alterius:  Congress' enactment of a provision
> defining the pre-emptive reach of a statute
> implies that matters beyond that reach are
> not pre-empted.

Cipollone, 505 U.S. at 517.  In discerning the proper scope of an express preemption provision, courts "focus on the plain wording

of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." <u>CSX Transp., Inc. v. Easterwood</u>, 507 U.S. 658, 664 (1993).

> **B.   The Federal Insecticide, Fungicide, and Rodenticide Act.**

Under FIFRA, a pesticide may not be sold in the United States unless it is first registered with the EPA.  As noted earlier in this order, the petition for registration must include data about the pesticide, as well as a proposed label.  <u>See</u> 7 U.S.C. § 136a(c)(1)(C), (F).

FIFRA defines "label" as "the written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers."  7 U.S.C. § 136(p)(1).  The term "labeling" includes:

> all labels and all other written, printed, or graphic matter--
>
> (A) accompanying the pesticide or device at any time; or
>
> (B) to which reference is made on the label or in literature accompanying the pesticide or device, except to current official publications of the Environmental Protection Agency, the United States Departments of Agriculture and Interior, the Department of Health and Human Services, State experiment stations, State agricultural colleges, and other similar Federal or State institutions or agencies authorized by law to conduct research in the field of pesticides.

7 U.S.C. § 136(p)(2).

The EPA "will register the pesticide if it determines

11

that the pesticide is efficacious . . . , § 136a(c)(5)(A); that
it will not cause unreasonable adverse effects on humans and the
environment, §§ 136a(c)(5)(C), (D); § 136(bb); and that its label
complies with the statute's prohibition on misbranding,
§ 136a(c)(5)(B); 40 CFR § 152.112(f) (2004)." Bates v. Dow
Agrosciences LLC, 544 U.S. 431, 438 (2005). "Unreasonable
adverse effects on the environment means any unreasonable risk to
man or the environment, taking into account the economic, social,
and environmental costs and benefits of the use of any
pesticide." 40 C.F.R. § 166.3. "A pesticide is 'misbranded' if
its label contains a statement that is 'false or misleading in
any particular.'" Bates, 544 U.S. at 438 (quoting 7 U.S.C.
§ 136(q)(1)(A); 40 CFR § 156.10(a)(5)(ii)). "A pesticide is also
misbranded if its label does not contain adequate instructions
for use, or if its label omits necessary warnings or cautionary
statements." Bates, 544 U.S. at 438 (citing 7 U.S.C.
§§ 136(q)(1)(F), (G)).

FIFRA has an express preemption section ("Authority of
States") that provides in relevant part:

(a) In general

A State may regulate the sale or use of any
federally registered pesticide or device in
the State, but only if and to the extent the
regulation does not permit any sale or use
prohibited by this subchapter.

(b) Uniformity

> Such State shall not impose or continue in
> effect any requirements for labeling or
> packaging in addition to or different from
> those required under this subchapter.

7 U.S.C. § 136v.

### C. <u>Bates</u>.

Mrs. Ansagay argues that <u>Bates v. Dow Agrosciences LLC</u>,
544 U.S. 431 (2005), controls the present case insofar as it
addressed FIFRA's preemptive effect on state-law claims.  <u>See</u> ECF
No. 24, PageID #s 537-41.  Dow counters that this court's
analysis should instead be guided by <u>Mutual Pharmaceutical Co.,
Inc. v. Bartlett</u>, 133 S. Ct. 2466 (2013), and <u>Pliva, Inc. v.
Mensing</u>, 131 S. Ct. 2567 (2011)--two cases that involved
preemption under the Federal Food, Drug, and Cosmetic Act
("FDCA").  <u>See</u> ECF No. 16-1, PageID #s 187-95.  <u>See</u> 21 U.S.C.
§ 301 <u>et seq.</u>  This court reads <u>Bates</u> as squarely on point.

In <u>Bates</u>, Texas peanut farmers filed suit against Dow
as the distributor of a weed killer called "Strongarm," alleging
that the pesticide had severely damaged their crops.  544 U.S. at
434-35.  The plaintiffs alleged that, although the label stated
that Strongarm was "recommended in all areas where peanuts are
grown," Dow knew or should have known that Strongarm was unsafe
for crops grown in soil with pH levels of 7.0 or greater.  <u>Id.</u>
Claims were asserted by the plaintiffs for strict liability,
negligence, fraud, breach of warranty, and violation of the Texas
Deceptive Trade Practices-Consumer Protection Act.  <u>Id.</u>  Dow

13

contended that the claims were preempted by FIFRA.  Id.

The district court agreed with Dow and held that FIFRA preempted every claim, except for one that was preempted on state-law grounds.  Id. at 436.  The Fifth Circuit affirmed, reasoning that "FIFRA preempts state laws that either directly or indirectly impose different labeling requirements," and that the farmers' claims were expressly preempted under § 136v(b) because a judgment against Dow would have induced Dow to alter its product label.  Dow Agrosciences LLC v. Bates, 332 F.3d 323, 331-33 (5th Cir. 2003), vacated and remanded, 544 U.S. 431 (2005). The Supreme Court reversed, holding that FIFRA did not preempt the plaintiffs' claims for defective design, defective manufacture, negligent testing, breach of express warranty, or violation of the Texas Deceptive Trade Practices-Consumer Protection Act.  Bates, 544 U.S. at 444.

In reaching its decision, the Bates Court observed that FIFRA's express preemption provision, § 136v, indicates that "the statute authorizes a relatively decentralized scheme that preserves a broad role for state regulation."  Id. at 450 (citation omitted).  FIFRA authorizes states to "ban or restrict the uses of pesticides that EPA has approved; they may also register, subject to certain restrictions, pesticides for uses beyond those approved by EPA."  Id. (citations omitted).  Under this statutory scheme, the Court noted:

14

>Section 136v(b) retains a narrow, but still
>important, role.  In the main, it pre-empts
>competing state labeling standards--imagine
>50 different labeling regimes prescribing the
>color, font size, and wording of warnings--
>that would create significant inefficiencies
>for manufacturers.  The provision also
>pre-empts any statutory or common-law rule
>that would impose a labeling requirement that
>diverges from those set out in FIFRA and its
>implementing regulations.  It does not,
>however, pre-empt any state rules that are
>fully consistent with federal requirements.

Id. at 452.  That is, the Bates Court read FIFRA and its express

preemption provision as seeking to impose uniformity of labeling

throughout the states, but without undermining the states'

historic ability to otherwise regulate the sale and use of

pesticides within their borders through statutes, regulations,

and common law.

The Court in Bates also articulated a two-part test to

determine whether a claim was preempted by FIFRA:  "First, it

must be a requirement 'for labeling or packaging'; rules

governing the design of a product, for example, are not

pre-empted.  Second, it must impose a labeling or packaging

requirement that is 'in addition to or different from those

required under this subchapter.'"  Id. at 444.  The Court

recognized that, while preempting state laws that impose a

"requirement" for labeling or packaging in addition to or

different from what is required under FIFRA, § 136v(b) never

defined "requirement."  The Court instructed that an "occurrence

that merely motivates an optional decision does not qualify as a
requirement" for the purpose of the above FIFRA preemption test.
Id. at 443.  Thus, for example, events "such as a jury verdict,
that might 'induce' a pesticide manufacturer to change its label"
should not be viewed as "requirements."  Id.

Turning to the individual claims, the Court first held
that claims for defective design, defective manufacture,
negligent testing, and breach of express warranty were not
preempted because none required Dow to label its products in any
particular way.  Id.  The Court explained, "Rules that require
manufacturers to design reasonably safe products, to use due care
in conducting appropriate testing of their products, to market
products free of manufacturing defects, and to honor their
express warranties or other contractual commitments plainly do
not qualify as requirements for 'labeling or packaging.'"  Id.

The breach of warranty claim, the Court explained, also
was not preempted because a warranty claim does not impose a
requirement "for labeling or packaging," but only asks "that a
manufacturer make good on the contractual commitment that it
voluntarily undertook by placing that warranty on its product."
Id. at 444 (footnote omitted).

The Court remanded the fraud and negligent-failure-to-
warn claims for a determination of whether the common-law duties
they imposed were equivalent to the FIFRA labeling requirements.

16

Id. at 447.

Dow now asks this court to read Bates as inapplicable because Bates addressed only express preemption, while this case involves implied conflict preemption. See ECF No. 16-1, PageID # 177; ECF No. 29, PageID # 742.  At the hearing on the motion, Dow's counsel--who also represented Dow in Bates--told the court that his recollection was that implied preemption was never before the Bates Court because neither party raised it.  Dow's counsel's recollection is mistaken.

A review of the briefs in Bates indicates that the parties and various amici curiae argued implied conflict preemption generally and impossibility preemption specifically. Dow's Answering Brief framed the question presented to the Bates Court as:

> Whether petitioners' claims for crop
> damages--which turn on the contention that
> respondent had a state-law obligation to warn
> them that its pesticide was not suitable for
> use on soils with elevated pH levels--are
> expressly or impliedly preempted by the
> Federal Insecticide, Fungicide, and
> Rodenticide Act, 7 U.S.C. § 136-136y.

Resp't's Br., 2004 WL 2758217 (U.S.), at i (emphasis added).  In the section arguing for implied conflict preemption, Dow's brief also referred the Court to the impossibility preemption arguments that the Product Liability Advisory Council, Inc., made as amicus curiae in support of Dow.  Id. at 36 n.24 ("On the question of implied or conflict preemption, we also refer the Court to the

17

brief filed by amicus Product Liability Advisory Council."); Brief for the Product Liability Advisory Council, Inc., as Amicus Curiae in Support of Respondent, 2004 WL 2681682 (U.S.), at 17.

Bates's Opening Brief similarly contended that the claims were not impliedly preempted. See Pet'r's Brief, 2004 WL 2075750 (U.S.), at 29; see also Pet'r's Reply Brief, 2004 WL 3017317 (U.S.), at 3, 7. Other amicus briefs filed with the Court also discussed whether the claims were preempted under the impossibility prong of implied conflict preemption. See Amicus Curiae Brief of the Defense Research Institute in Support of Respondent, 2004 WL 2714007 (U.S.), at 29; Brief for American Chemistry Council as Amicus Curiae in Support of Respondent, 2004 WL 2681683 (U.S.), at 5-6. Justice Thomas noted as much, stating that Dow had argued that there was both express and implied preemption under FIFRA. See 544 U.S. at 458 (Thomas, J., concurring in part, dissenting in part). Implied conflict preemption, including impossibility conflict in particular, was indeed before the Bates Court.

That these arguments, while properly raised by both parties, were ignored in the majority opinion indicates that the Bates Court rejected impossibility preemption sub silentio. See Dennis v. Higgins, 498 U.S. 439, 449 (1991) (noting implicit rejection of argument concerning relief under 42 U.S.C. § 1983); Jackson v. Metro. Edison Co., 419 U.S. 345, 354 n.9 (1974)

(same).

It makes no sense to think otherwise.  The <u>Bates</u> Court was reversing the court of appeals' preemption decision and had to consider any arguments that, if successful, would have affirmed the lower court decision finding preemption.  <u>See, e.g.</u>, <u>Elgin, J. & E. Ry. Co. v. Burley</u>, 325 U.S. 711, 720 (1945), <u>adhered to on reh'g</u>, 327 U.S. 661 (1946) (when court of appeals reversed judgment of district court but made no reference to the ground upon which district court granted judgment or defendant's arguments in support of affirmance, "its judgment must be taken to have determined implicitly that none of [defendant's] contentions in these respects is valid").  Prior to <u>Bates</u>, the Supreme Court had already clarified in <u>Geier v. American Honda Motor Co.</u>, 529 U.S. 861, 869-70 (2000), that even though a state law is not within the domain expressly preempted, the state law may be preempted if it frustrates the purpose of the federal law or makes compliance with both federal and state law impossible.  The <u>Bates</u> Court thus had to consider any arguments that the claims were impliedly preempted because such arguments, if persuasive, would have necessarily led to an affirmance of the decision on appeal.  The Court's reversal of the court of appeals in the face of Dow's implied conflict preemption arguments in support of affirmance thus indicates that the Court implicitly rejected Dow's contentions.

19

It is understandable that the Bates Court did not explicitly address implied preemption.  The Court concluded that Congress had expressed its intent in § 136v to allow states to exercise broad authority under FIFRA to regulate pesticides through state common law, so long as the states did not impose labeling or packaging requirements contrary to what was federally required.  In so concluding, the Court identified as the determinative issue regarding FIFRA preemption the question of whether a claim imposed a labeling or packaging requirement different from a FIFRA requirement.  Under the circumstances before it in Bates, once the Court concluded that the claims were not expressly preempted, it would have been inconsistent for the Court to have concluded that FIFRA somehow impliedly preempted those same claims.  Indeed, Justice Thomas, concurring in the judgment in part and dissenting in part, commended the majority for "rightly declin[ing] to address respondent's argument that petitioners' claims are subject to other types of pre-emption." Bates, 544 U.S. at 458.  As he put it, "Today's decision thus comports with this Court's increasing reluctance to expand federal statutes beyond their terms through doctrines of implied pre-emption."  Id. at 459.

Even if Bates cannot be read as having rejected impossibility preemption and this court must therefore perform its own impossibility preemption analysis in connection with

20

Dow's arguments, Dow's summary judgment motion fails.

Dow argues that "[f]ederal law required [Dow] to make
and sell Dursban TC exactly as the EPA had registered it, and a
court may not hold a civil defendant liable under state law for
conduct federal law requires."  ECF No. 16-1, PageID # 179.  Dow
cites to several statutory provisions and EPA regulations in this
regard, including 40 C.F.R. § 152.130(a), which provides that
"[a] registrant may distribute or sell [the] registered product
with the composition, packaging and labeling currently approved
by the Agency."  See id., PageID #s 187-95.  The import of Dow's
argument is clear, namely, that any state law that could
indirectly regulate a registered pesticide runs afoul of FIFRA's
directive that a pesticide must be sold and labeled as approved
by FIFRA.

However, "[t]o say, as the statute does, that [a
defendant] may not market a [product] without federal approval
(i.e., without an . . . approved label) is not to say that
federal approval gives [a defendant] the unfettered right, for
all time, to market its [product] with the specific label that
was federally approved."  Wyeth, 555 U.S. at 592 (Thomas, J.,
concurring in the judgment).  "Initial approval of a label
amounts to a finding by the [applicable federal agency] that the
label is safe for purposes of gaining federal approval to market
the [product].  It does not represent a finding that the

21

[product], as labeled, can never be deemed unsafe by later federal action, or as in this case, the application of state law." Id.

The statutory and regulatory scheme created by FIFRA and its interpreting regulations contemplates that each state will regulate pesticide sales and use within its borders and authorizes such action. See 7 U.S.C. § 136v(a). The EPA's own website acknowledges that "states have primary authority for compliance monitoring and enforcing against illegal pesticide use." See EPA, About Pesticide Registration, http://www.epa.gov/pesticide-registration/about-pesticide-registration (last visited Dec. 17, 2015). For instance, states may under certain conditions register a new end use pesticide for any use. See 40 C.F.R. § 162.152. This may require a state to perform an independent "unreasonable adverse effects" determination based on data submissions, just as the EPA would for proposed nationwide use products. 40 C.F.R. § 162.153.

More significantly, although Dow is correct that FIFRA makes it unlawful for any person to distribute or sell "any registered pesticide the composition of which differs . . . from its composition as described in connection with its registration under Section 136a," 7 U.S.C. § 136j(a)(1)(C), FIFRA does not foreclose each state from restricting or outright banning registered pesticides from being used and sold within its

22

borders.  Cf. Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 613-14 (1991) ("FIFRA nowhere seeks to establish an affirmative permit scheme for the actual use of pesticides.  It certainly does not equate registration and labeling requirements with a general approval to apply pesticides throughout the Nation without regard to regional and local factors like climate, population, geography, and water supply.").

FIFRA permits a state to ban the sale of a pesticide within the state if the state finds, for instance, that one of the pesticide's label-approved uses is unsafe.  Bates, 544 U.S. at 446 (instructing that § 136v "confirms the State's broad authority to regulate the sale and use of pesticides.  Under § 136v(a), a state agency may ban the sale of a pesticide if it finds, for instance, that one of the pesticide's label-approved uses is unsafe." (footnote omitted)); id. at 450 (FIFRA "authorizes a relatively decentralized scheme that preserves a broad role for state regulation.  Most significantly, States may ban or restrict the uses of pesticides that EPA has approved; they may also register, subject to certain restrictions, pesticides for uses beyond those approved by EPA." (citations omitted)).  Cf. Mortier, 501 U.S. at 615 (holding that respondent could not rely on theory that compliance with FIFRA and local ordinances regulating pesticides was a physical impossibility).

A state's ability to ban or restrict the use of an EPA-

approved pesticide clearly undercuts Dow's sweeping contention that any state law that impedes Dow's ability to sell its registered product runs afoul of FIFRA.  Dow, as the party moving for summary judgment on its preemption defense, has the burden of showing that it is truly impossible for it to comply with both FIFRA and state law.  Dow fails to carry this burden.

Bates clearly applies and is not trumped by the later decisions in Bartlett and Mensing.  Neither Mensing nor Bartlett overruled Bates as it applies to FIFRA.  Mensing cited approvingly to Bates, see Mensing, 131 S. Ct. at 2592, and Bartlett also addressed Bates without overruling it, see Bartlett, 133 S. Ct. at 2480.  In addition, the holdings in Bartlett and Mensing addressed preemption under the Federal Food, Drug, and Cosmetic Act, which differs from FIFRA in vital ways.

Unlike FIFRA, the FDCA, as construed in Bartlett and Mensing, lacked any express preemption provision applicable to the preemption issues raised in Bartlett and Mensing.  See Bartlett, 133 S. Ct. at 2470-71; Mensing, 131 S. Ct. at 2574.  See 21 U.S.C. § 301 et seq.  The statutory scheme in the FDCA does not contemplate FIFRA's level of state participation in regulating products within a federal statute's purview.  Finally, Mensing and Bartlett relied on another detail entirely absent here, namely that the defendants in those cases were generic drug manufacturers.

24

In <u>Mensing</u>, plaintiffs alleged that generic drug manufacturers had violated state tort laws by failing to alter generic drug labels to adequately warn of the risk of severe neurological disorder.  131 S. Ct. at 2573.  The defendants argued that the claims were preempted by the FDCA.  <u>Id.</u>  Because the FDCA did not contain an express preemption provision, the Court turned to implied conflict preemption and held that it was impossible for the generic drug manufacturers to comply with both state tort duties and the FDCA duties imposed on generic drug manufacturers.  <u>Id.</u>

Key to the Court's decision was its recognition that, under the FDCA, generic drug manufacturers had a "duty of sameness," which required that the labels and composition of generic drugs at all times be the same as brand name drugs.  <u>Id.</u> at 2574.  The state tort laws at issue in <u>Mensing</u> required manufacturers that are "or should be aware of [their] product's danger to label that product in a way that renders it reasonably safe."  <u>Id.</u> at 2573.  The Court explained:

> If the Manufacturers had independently changed their labels to satisfy their state-law duty, they would have violated federal law.  Taking [plaintiffs'] allegations as true, state law imposed on the Manufacturers a duty to attach a safer label to their generic [drug].  Federal law, however, demanded that generic drug labels be the same at all times as the corresponding brand-name drug labels.  Thus, it was impossible for the Manufacturers to comply with both their state-law duty to change the

25

> label and their federal law duty to keep the
> label the same.

Id. at 2578 (citation omitted).  In other words, the Mensing
Court held that the plaintiffs' state-law claims were preempted
by the FDCA because it was impossible for the generic drug
manufacturers to comply with their state-law duty to unilaterally
change the label and their federal law duty to keep the label the
same.

The Court noted that its holding was specific to
generic drug manufacturers:  "It is beyond dispute that the
federal statutes and regulations that apply to brand-name drug
manufacturers are meaningfully different than those that apply to
generic drug manufacturers. . . .  But different federal statutes
and regulations may, as here, lead to different pre-emption
results."  Id. at 2582.

Two years later, the Supreme Court applied the Mensing
preemption analysis in Bartlett, another case involving the
FDCA's preemptive effect on state-law claims asserted against a
generic drug manufacturer.  133 S. Ct. 2466.  The plaintiff in
Bartlett sued the manufacturer of a generic anti-inflammatory
drug, asserting failure-to-warn and design-defect claims.  Id. at
2470.  She had developed an acute case of toxic epidermal
necrolysis after taking the drug.  Id.  At the outset, the Court
noted that "the FDCA's treatment of prescription drugs includes
neither an express pre-emption clause . . . , nor an express

non-pre-emption clause . . . .  In the absence of that sort of 'explicit' expression of congressional intent, we are left to divine Congress' will from the duties the statute imposes" by analyzing the statute for an implied conflict.  <u>Id.</u> at 2480. Applying the impossibility preemption analysis in <u>Mensing</u>, the <u>Bartlett</u> Court concluded that it was impossible for the generic drug manufacturer to comply with its state-law duty to strengthen the warnings on the label and its federal-law duty not to alter the label, and that the state law was therefore preempted.  <u>Id.</u> at 2476-7 ("[<u>Mensing</u>] made clear [that] federal law prevents generic drug manufacturers from changing their labels.  Thus, federal law prohibited [the defendant] from taking the remedial action required to avoid liability under [state] law.").

Unsurprisingly, courts construing <u>Bartlett</u> and <u>Mensing</u> have pointed out that preemption in both cases depended on the defendants' status as generic drug manufacturers.  For instance, the Sixth Circuit observed:

> Important to the preemption findings in <u>Bartlett</u> and <u>Mensing</u> is the fact that generic drug manufacturers are prohibited from making any unilateral changes to the drug's composition or label, which is known as the "sameness" requirement.  Therefore, in <u>Mensing</u>, the Supreme Court determined that the plaintiffs' state law failure to warn claims regarding the generic drug were barred by impossibility preemption because the duty of sameness prohibited the generic manufacturers from unilaterally strengthening the drug's label so as to comply with their state-law duties.  Likewise, in <u>Bartlett</u>, the

27

> Court found that the plaintiff's state law
> design defect claim regarding the generic
> drug was barred by impossibility preemption
> because the sameness requirement prohibited
> the manufacturer from unilaterally changing
> the composition or labeling of the drug, as
> state law required.

<u>Yates v. Ortho-McNeil-Janssen Pharm., Inc.</u>, No. 15-3104, 2015 WL
8538119, at *10 (6th Cir. Dec. 11, 2015); <u>see also</u> <u>Moretti v.
Wyeth, Inc.</u>, 579 Fed. Appx. 563, 565 (9th Cir. 2014), <u>cert.
denied</u>, 135 S. Ct. 1398 (2015); <u>Mullins v. Ethicon, Inc.</u>, No.
2:12-CV-02952, 2015 WL 7761033, at *6 (S.D.W. Va. Dec. 2, 2015);
<u>In re Tylenol (Acetaminophen) Mktg.</u>, No. 2436, 2015 WL 7075949,
at *21 (E.D. Pa. Nov. 13, 2015).

<u>Mensing</u> and <u>Bartlett</u> are simply not analogous to the
case before this court.  Even if <u>Mensing</u> and <u>Bartlett</u>'s holdings
were applicable beyond the generic drug manufacturer context
(that is, to brand name drug manufacturers), <u>Bates</u> would control
the present case insofar as it addressed the very same statute
and issues before this court.

### D.    Mrs. Ansagay's State-Law Claims.

Mrs. Ansagay has asserted claims for wrongful death,
negligence, breach of express warranty, breach of implied
warranty, strict product liability, defective design, testing,
and/or manufacturing, negligent infliction of emotional distress,
and intentional infliction of emotional distress.  <u>See</u> ECF No.
32, PageID #s 816-20.

28

Again, under <u>Bates</u>, "[f]or a particular state rule to be pre-empted, it must satisfy two conditions.  First, it must be a requirement 'for labeling or packaging'; rules governing the design of a product, for example, are not pre-empted.  Second, it must impose a labeling or packaging requirement that is 'in addition to or different from those required under this subchapter.'"  544 U.S. at 444.  "Only if an action fulfills both requirements of the test is it preempted by FIFRA."  <u>Gucciardi v. Bonide Products, Inc.</u>, 28 F. Supp. 3d 383, 390 (E.D. Pa. 2014) (citing <u>Bates</u>, 544 U.S. at 444).

### 1.  **Negligence** (**Counts II & III**).

"It is well-established that, in order for a plaintiff to prevail on a negligence claim, the plaintiff is required to prove all four of the necessary elements of negligence: (1) duty; (2) breach of duty; (3) causation; and (4) damages."  <u>Cho v. State</u>, 168 P.3d 17, 23 n.11 (Haw. 2007) (citation omitted).

Counts II and III allege that Dow owed a duty of care not to injure the consumer or user of Dursban TC.  <u>See</u> ECF No. 32, PageID # 816.  Count II alleges that Dow breached that duty by supplying the carcinogenic Dursban TC, and that this caused Mr. Ansagay's adenocarcinoma.  <u>Id.</u>  Count III alleges that Dursban TC caused him to suffer infertility and depression.  <u>Id.</u>

These claims are not preempted under <u>Bates</u> because they do not impose a labeling or packaging requirement.  Instead, they

29

are based on the idea that Dursban TC itself was unsafe.  <u>See</u> 544
U.S. at 444 ("Rules that require manufacturers to design
reasonably safe products, to use due care in conducting
appropriate testing of their products, to market products free of
manufacturing defects, and to honor their express warranties or
other contractual commitments plainly do not qualify as
requirements for 'labeling or packaging.'").

### 2. Defective Design, Testing, and/or Manufacturing (Count VII).

Mrs. Ansagay also alleges that Dow was negligent in
designing, testing, and manufacturing Dursban TC.  <u>See</u> ECF No.
32, PageID # 819.  According to this count, Dow was "negligent in
not taking reasonable measures in designing Dursban to protect
against a foreseeable risk of injury," and that, "[d]ue to
Defendants['] negligence in design, testing, and/or
manufacturing, Dursban injured Mr. Ansagay."  <u>See</u> <u>id.</u>  Like the
other negligence-based claims in this case, this claim is not
preempted by FIFRA.  <u>See</u> <u>Bates</u>, 544 U.S. at 444.

Although Dow attempts to characterize this and other
counts as disguised failure-to-warn claims, this is incorrect.
Mrs. Ansagay acknowledges that Mr. Ansagay unfortunately
disregarded the clear warnings on the label that instructed users
of Dursban TC to wear a respirator because of the health risks
posed by the pesticide.  In Count VII, Mrs. Ansagay is not
pursuing any failure-to-warn claims against Dow for this reason.

The common thread in her negligence claims is instead that Dow designed an unreasonably dangerous substance.

### 3. Breach of Express and Implied Warranties (Counts IV & V).

Mrs. Ansagay asserts claims for the breach of express and implied warranties pursuant to Haw. Rev. Stat. § 490:2-318. Haw. Rev. Stat. § 490:2-318 provides:

> A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty.  A seller may not exclude or limit the operation of this section with respect to injury to the person of an individual to whom the warranty extends.

Accordingly, to prevail on the claim for breach of an express warranty, Mrs. Ansagay must prove that 1) Dow was a seller or lessor in a sale or lease of goods; 2) Mr. Ansagay was reasonably expected to use, consume or be affected by the goods; 3) a representation, affirmation of fact, or promise regarding the goods was made to Mr. Ansagay by Dow or an authorized agent of Dow, and that representation, affirmation of fact, or promise became part of the basis of the bargain between Dow and Mr. Ansagay; 4) the goods as delivered did not conform to that representation, affirmation of fact, or promise; and 5) failure of the goods to conform to the representation, affirmation of fact, or promise was a legal cause of the injuries Mrs. Ansagay asserts.  See Haw. R. Civ. Jury Instr. 12.1.

31

With regard to the breach of an express warranty, Mrs. Ansagay alleges that Dow "voluntarily assumed an explicit warranty that their product was safe to use for a pesticide applicator," that Dow "breached [its] contractually assumed express warranty by supplying a product that caused Mr. Ansagay's cancer, infertility, and depression," and that "[a]ny warranty disclaimer or limitation of liability clause offered by Defendants for a product as dangerous as Dursban would be unconscionable and unenforceable by law."  ECF No. 32, PageID # 817.  Mrs. Ansagay further alleges that an "agent, employee, and or representatives of Van Waters and/or other chemical sales corporations that purchased Dursban TC from Dow and sold it to XTermco, represented to Mr. Ansagay that Dursban TC was safe because the E.P.A. would not allow any pesticide to be sold that the body could not flush out."  See id., PageID # 810.

With regard to the breach of an implied warranty, Mrs. Ansagay alleges that the law imposes an implied warranty of fitness for a particular purpose, and that Dow breach this warranty by supplying a product that caused cancer, infertility, and depression.  See id., PageID # 818.

FIFRA does not preempt claims for breach of an express warranty, as express warranty claims are not based on a requirement that a manufacturer label its products in any particular way.  Bates, 544 U.S. at 444.  A "cause of action on

an express warranty asks only that a manufacturer make good on the contractual commitment that it voluntarily undertook by placing that warranty on its product," rather than requiring a manufacturer to include specific content that could conflict with FIFRA labeling and packaging requirements.  Id. at 443-44; see also Wuebker v. Wilbur-Ellis Co., 418 F.3d 883, 887 (8th Cir. 2005) (implied warranty of fitness for a particular purpose claim not preempted by FIFRA because it does not impose labeling or packaging requirement); Gucciardi, 28 F. Supp. 3d at 391; Snyder v. Farnam Companies, Inc., 792 F. Supp. 2d 712, 719 (D.N.J. 2011).  Mrs. Ansagay's express warranty claims are not preempted as based on "labeling requirements" because those claims derive solely from Dow, the warrantor, and are not imposed by state law.

        With respect to any warranty, express or implied, the EPA allows a label to be revised without registration of an amended or new product if the revision consists of "[c]hanges in warranty or warranty disclaimer statements."  See Pesticide Registration (PR) Notice 1988-6 (Aug. 12, 1988), at http://www.epa.gov/pesticide-registration/prn-88-6-change-registration-procedures-agency-approval-not-required-certain. Thus, Dow could at least potentially comply with FIFRA and at the same time alter the warranties on the Dursban TC label.

### 4.   Strict Product Liability (Count VI).

Under Hawaii law, a plaintiff's burden with respect to a claim of strict product liability "is to prove (1) a defect in the product which rendered it unreasonably dangerous for its intended or reasonably foreseeable use; and (2) a causal connection between the defect and the plaintiff's injuries." Tabieros v. Clark Equip. Co., 944 P.2d 1279, 1297 (Haw. 1997).  A product may be defective because it was defectively manufactured, was defectively designed, or carried an insufficient warning. See Torres v. N.W. Eng'g Co., 949 P.2d 1004, 1018 (Haw. Ct. App. 1997).

Count VI asserts that Dursban TC had a defect that caused cancer, male infertility, and depression, and that this defect made the product unreasonably dangerous for its intended or reasonably foreseeable use.  See ECF No. 32, PageID # 818. Insofar as Mrs. Ansagay does not base this strict product liability claim on an insufficient warning, it is not preempted by FIFRA.

### 5.   Intentional & Negligent Infliction of Emotional Distress (Counts VIII & IX).

"Under Hawaii law, the elements of [intentional infliction of emotional distress] are '(1) that the act allegedly causing the harm was intentional or reckless, (2) that the act was outrageous, and (3) that the act caused (4) extreme emotional distress to another.'"  Enoka v. AIG Hawai'i Ins. Co., 128 P.3d

850, 872 (Haw. 2006) (quoting <u>Hac v. Univ. of Haw.</u>, 73 P.3d 46, 60-61 (Haw. 2003)).  The Hawaii Supreme Court defines the term "outrageous" as "'without just cause or excuse and beyond all bounds of decency.'"  <u>Enoka</u>, 128 P.3d at 872 (quoting <u>Lee v. Aiu</u>, 936 P.2d 655, 670 n.12 (Haw. 1997)).  "Moreover, 'extreme emotional distress' constitutes, inter alia, mental suffering, mental anguish, nervous shock, and other 'highly unpleasant mental reactions.'"  <u>Enoka</u>, 128 P.3d at 872 (citation omitted).

The elements of a claim for negligent infliction of emotional distress are:  (1) that the defendant engaged in negligent conduct; (2) that the plaintiff suffered serious emotional distress; and (3) that such negligent conduct of the defendant was a legal cause of the serious emotional distress. <u>Tran v.State Farm Mut. Automobile Ins. Co.</u>, 999 F. Supp. 1369, 1375 (D. Haw. 1998).  A cognizable claim for NIED under Hawaii law also requires "physical injury to either a person or property," <u>see</u> <u>Calleon v. Miyagi</u>, 876 F.2d 1278 (1994), or a mental illness, <u>see</u> Haw. Rev. Stat. § 663-8.9.

The IIED and NIED claims in Counts VIII and IX are not premised on any allegation that the packaging or labeling of Dursban TC provided an inadequate warning of its dangers or should have otherwise been changed.  <u>See</u> ECF No. 32, PageID #s 819-20.  Neither claim is preempted.

6.   **Wrongful Death (Count I).**

Mrs. Ansagay also brings a claim for wrongful death under Haw. Rev. Stat. § 663-3, alleging that as a result of Dow's wrongful act or negligence she and her son suffered "[l]oss of society, companionship, comfort, consortium, and protection"; "[l]oss of marital care, attention, advice, or counsel"; and "[l]oss of parental care, training, guidance, or education, suffered as a result of the death of the person."  See ECF No. 32, PageID # 816.

Wrongful death is a derivative claim under Hawaii law. See, e.g., Yamamoto v. Premier Ins. Co., 4 Haw. App. 429, 668 P.2d 42, 48 (1983), overruled on other grounds by Doi v. Hawaiian Ins. & Guar. Co., Ltd., 727 P.2d 884 (1986); Hara v. Island Ins. Co., Ltd., 759 P.2d 1374, 1375-76 (Haw. 1988).

The wrongful death claim in Count I is not preempted to the extent it is based on underlying claims that are not preempted.

E.   **Restatement (Second) of Torts § 402A.**

In addition to arguing preemption, Dow contends, "In states that have adopted § 402A of the Restatement (Second) of Torts (like Hawai'i),[2] there is broad agreement that a legally

---

[2] Section 402A provides that:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to

36

adequate warning negates liability under each of Plaintiffs'
theories, and it negates liability for punitive damages as well."
See ECF No. 16-1, PageID # 193.  Dow appears to argue that its
EPA-approved label is categorically a legally adequate warning
barring all claims.  Id.  The court is unpersuaded.

In support of its assertion, Dow relies on Temple v.
Velcro USA, Inc., 196 Cal. Rptr. 531 (Cal. Ct. App. 1983), and
Papike v. Tambrands, Inc., 107 F.3d 737, 744 (9th Cir. 1997), a
Ninth Circuit case construing Temple.  See ECF No. 16-1, PageID #
193.  But in California Henley v. Philip Morris Inc., 9 Cal.
Rptr. 3d 29 (Cal. Ct. App. 2004), the California Court of Appeals
rejected a similar argument.

------

liability for physical harm thereby caused to
the ultimate user or consumer, or to his
property, if

(a) the seller is engaged in the
business of selling such a product, and

(b) it is expected to and does reach the
user or consumer without substantial
change in the condition in which it is
sold.

(2) The rule stated in Subsection (1) applies
although

(a) the seller has exercised all
possible care in the preparation and
sale of his product, and

(b) the user or consumer has not bought
the product from or entered into any
contractual relation with the seller.

The defendant in _Henley_ cited to both _Temple_ and _Papike_ for the proposition "that a product labeled with mandatory warnings 'cannot' be found to 'fail California's consumer expectations test.'" _Henley_, 9. Cal. Rptr. at 55-56. Rejecting this argument, the _Henley_ court explained:

> In _Papike v. Tambrands Inc._ (9th Cir. 1997) 107 F.3d 737, _cert. denied_, the court affirmed a summary judgment for a tampon manufacturer on a claim that its product caused the plaintiff to suffer toxic shock syndrome. Defendant cites the case for its disposition of the plaintiff's consumer expectations claim in two terse sentences: 'Tambrands' warnings met the federal requirements and Papike's design defect claim therefore fails the 'consumer expectation' test. To rule otherwise would allow the anomalous circumstance that a consumer is entitled to expect a product to perform more safely than its government-mandated warnings indicate.' We are unpersuaded that these comments conform to California law, at least if taken outside the facts of that case. The warnings there might well have justified summary judgment for the defendant, because they explicitly notified the user of the very danger at issue and there is no suggestion of any countervailing evidence raising a genuine material issue of fact as to the likely expectations of consumers. The court's unilluminated statement that liability would be 'anomalous' does not furnish a sufficient ground to take the matter from the jury.

_Id._ at 56. The court next addressed _Temple_ and stated that "[n]othing in that decision suggests that a government-mandated warning categorically bars liability for a product otherwise shown to be more dangerous than ordinary consumers expect." _Id._

Dow also cites to _Gauthier v. AMF, Inc._, 788 F.2d 634

38

(9th Cir. 1986), opinion amended on denial of reh'g, 805 F.2d 337 (9th Cir. 1986), a case construing Montana law.  But that case held that the "adequacy of the warnings is a proper jury question."  788 F.2d at 636.  The existence of a federal agency-approved warning label was not a categorical bar against state-law claims alleging that the product was unreasonably dangerous.

Indeed, Texas, the state that Bates arose in, had adopted Restatement (Second) of Torts § 402A long before Bates was litigated.  See, e.g., FFE Transp. Services, Inc. v. Fulgham, 154 S.W.3d 84, 87 (Tex. 2004) ("In McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787, 788-89 (Tex. 1967), we adopted section 402A of the Restatement (Second) of Torts on the scope of strict products liability.").  This did not cause the state-law claims in Bates to be barred on the ground that there was an existing government-approved warning label.

These cases contradict Dow's assertion that section 402A immunizes manufacturers from liability under state law when there is a federally approved warning label.  More importantly, Dow does not cite to any case in Hawaii that stands for the sweeping proposition Dow advances.

There is another reason that Dow's arguments with respect to section 402A fail.  Dow specifies that preemption establishes the legal adequacy of the warning.  See ECF No. 16-1, PageID # 193 ("Because preemption forbids any challenge to the

39

legal sufficiency of Dursban TC's label, [Dow] has established a 'proper disclaimer to any express or implied warranties,' and has established preemption of Plaintiffs' claims of negligence, and for negligent and intentional infliction of emotional distress.").  But Dow has not established that any claim is preempted.

Dow is not entitled to summary judgement as to any of Ansagay's claims based on section 402A of the Restatement (Second) of Torts.

**F.   Other Arguments Raised for the First Time in Dow's Reply.**

In its Reply, Dow asserts for the first time certain arguments relating to the breach of warranty claims.  <u>See</u> ECF No. 29, PageID #s 739-42, 750-51.  This court declines to address those new contentions raised for the first time in the reply brief.  <u>See</u> Local Rule 7.4 ("A reply must respond only to arguments raised in the opposition.  Any argument raised for the first time in the reply shall be disregarded.").

**G.   Mrs. Ansagay's Concise Statement.**

Under Local Rule 56.1(b), any party opposing a motion for summary judgment "shall file and serve with his or her opposing papers a separate document containing a single concise statement that admits or disputes the facts set forth in the moving party's concise statement, as well as sets forth all material facts as to which it is contended there exists a genuine

40

issue necessary to be litigated." Material facts set forth in the moving party's concise statement "will be deemed admitted unless controverted by a separate concise statement of the opposing party." Local Rule 56.1(g). "When preparing the separate concise statement, a party shall reference only the material facts that are absolutely necessary for the court to determine the limited issues presented in the motion for summary judgment (and no others), and each reference shall contain a citation to a particular affidavit, deposition, or other document that supports the party's interpretation of the material fact." Local Rule 56.1(c).

Mrs. Ansagay, by not filing a concise statement, has failed to comply with Local Rule 56.1. Although this court could, on this basis, deem assertions in Dow's concise statement admitted under Local Rule 56.1(g), this would not affect summary judgment here. Preemption is a legal issue that can be resolved without further factual development of the record in this case. As for Dow's factual arguments, deeming the assertions in Dow's concise statement as admitted would not entitle it to summary judgment. Dow's concise statement asserts that (1) Dursban TC was registered with the EPA under FIFRA; (2) Dursban TC was at all times registered with the Hawaii Department of Agriculture under the Hawaii Pesticides Law, chapter 149A; (3) Dow always sold Dursban TC with the approved label and chemical composition;

(4) Dursban TC remained properly registered at all relevant times; (5) the active ingredient in Dursban TC is chlorpyrifos; (6) Dursban TC included certain language in its warning label, such as "WARNING" and "MAY BE FATAL IF SWALLOWED," and "EXCESSIVE ABSORPTION THROUGH SKIN MAY BE FATAL"; and (7) the EPA currently does not view chlorpyrifos as a human carcinogen.  See ECF No. 17, PageID #s 200-02.  These facts, even if admitted, would not establish that Dow is entitled as a matter of law to a judgment based on preemption with respect to any of Mrs. Ansagay's claims.

**V.        CONCLUSION.**

As stated above, Dow's motion for summary judgment is denied.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, December 29, 2015.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

Ansagay, et al. v. Dow Agrosciences LLC, et al., Civ. No. 15 00184 SOM/RLP; ORDER DENYING MOTION FOR SUMMARY JUDGMENT.

42